**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RICKY LAMAR PERRY and TERRI
KIMBROUGH-PERRY, husband and wife,

    Plaintiffs,

v.                                 Case No. 04-CV-72605-DT

LIFE TIME FITNESS, INC. d/b/a LIFE TIME
FITNESS,

    Defendant.
                                /

**OPINION AND ORDER GRANTING DEFENDANT'S
"MOTION FOR SUMMARY JUDGMENT"**

Pending before the court in this race discrimination case is Defendant Life Time Fitness's ("Life Time") "Motion for Summary Judgment." The court held a hearing in this matter on May 4, 2005. For the reasons stated below, the court will grant Defendant's motion.

**I. BACKGROUND**

On or about January 15, 2004, Plaintiff Terri Kimbrough-Perry ("Kimbrough-Perry") entered into a membership agreement with Life Time, which included access to the facility for herself, her husband Plaintiff Ricky Lamar Perry ("Perry") and their two children, Michelle and Rickhiya. (Pl.'s Compl. at ¶ 4; Kimbrough-Perry Dep. at 5.) On or about February 4, 2004, Perry joined the club's winter basketball league. (Def.'s Mot. at ¶ 15; Perry Dep. at 8-9.) Mr. Doug Pickett, the Life Time employee who was responsible for organizing and supervising the winter basketball league, added Perry to an existing team roster - the "blue team." (Perry Dep. at 10-13; Def.'s Mot. at ¶ 15.) On

March 3, 2004, Plaintiff asked Mr. Pickett if his two cousins, Dujuan Frazier ("Frazier") and Sidney Bonner ("Bonner") could join the league to play the remaining few games since some members of the league were not showing up on a regular basis. (Perry Dep. at 15-16; Def.'s Mot. at ¶ 16-17.) Mr. Pickett agreed to Perry's request, and in early March 2004, Frazier and Bonner joined the league as non-members/guests. (*Id.*)

The winter basketball league holds its games on only one of the club's two basketball courts - the Members Activities Court. The other court, the Members Pickup Court, is reserved strictly for members only pick-up basketball. (Vitale Dep. at 12-13; Jubb Dep. at 8; Perry Dep. at 30-31.) It is undisputed that pursuant to Life Time's rules, non-members/guests may not use the gymnasium to play pick-up basketball at any time. (*Id.*) This rule is included in the guest policy sheet, the gym membership contract, and is posted on the wall of the gymnasium. (*Id.*; Bell Dep. at 34.) In addition, access to the club for non-members/guests participating in the winter basketball league is limited to the dates and times of the non-member/guest's scheduled league games. (Vitale Aff. at ¶ 5.)

On the evening of March 28, 2004, Perry, Frazier, and Bonner arrived at the club for their league's playoff game scheduled for 8:00 p.m. (Perry Dep. at 25; Frazier Dep. at 21.) Frazier and Bonner each handed identification to the front desk employee, informed the employee that they were there for a league basketball game, and signed the guest registration book. (Perry Dep. at 27-28; Bonner Dep. at 9-11, 14; Frazier Dep. at 10-11; 20-21.) After Perry, Frazier, and Bonner checked in, they went to the locker room to change their clothes for the game. (Bonner Dep. at 15-16; Frazier Dep. at 22.) Shortly after arriving, Mr. Pickett informed Perry that the scheduled game had been

2

forfeited. (Def.'s Mot. at ¶ 23; Perry Dep. at 31; Bonner Dep. at 18-19; Fraizer Dep. at 22-23.) Perry then asked Bonner and Frazier to stay and play pick-up basketball on the Members Pick-Up Court. (Perry Dep. at 31-32; Frazier Dep. at 22-26.) Perry, Frazier, and Bonner proceeded to the pick-up court where a game was already in session. (Perry Dep. at 32-33.) The three waited for their turn along with other members and played in the next pick-up game, which Perry's team won. (Perry Dep. at 33; Bonner Dep. at 22-23; Frazier Dep. at 26.)

Brian Vitale, a member of the losing team and off-duty Life Time employee, approached Frazier and Bonner because he recognized them as non-members. (Vitale Dep. at 14.) Vitale when on-duty was in charge of greeting and checking-in members and guests. (*Id.*) Based on his prior experiences when Fraizer and Bonner checked in for a game, he knew that they were not members. (*Id.* at 14-15; Vitale Aff. at ¶¶ 7-9.)

Vitale testified in his affidavit that "on one occasion in particular when Frazier and Bonner attempted to check-in for a scheduled league game, [he] noticed that one of their names was not present on the league roster. Before allowing them to enter, [he] inquired with Mr. Pickett, . . . , whether Dujuan Frazier and Sidney Bonner were participants in the basketball league. On that occasion, Pickett verified that they were indeed signed up for the basketball league as non-member/guests. Due to [this] past experience with Dujuan Frazier and Sidney Bonner, [he] recognized them on the pick-up basketball court on March 28, 2004, and knew that they were not members." (Vitale Aff. at ¶ 8-9.)

Perry, apparently contradicting the testimony of his cousins, testified that Vitale did not ask Bonner or Frazier for their membership, but asked only Perry for his name

3

and whether he had a Life Time membership, while swearing and speaking loudly. (Perry Dep. at 43-44, 47.)  Perry claims that he told Vitale that it was "none of his business." (*Id.* At 44; Vitale Dep. at 21.)  Perry maintains that the two other players on Perry's team, who were Caucasian, were not questioned about their membership.  (*Id.*)  Perry also indicates that the two other men playing on his team questioned Vitale why he was demanding that Perry prove his membership when it was not being sought from anyone else.  (Perry Dep. at 53.)

Vitale left the court, went into the gym and came back out with two on-duty employees who were in uniform and wearing identification badges, Jonathan Michael Bell ("Bell") and David Jubb ("Jubb").  Vitale told them that non-members were playing pick-up basketball.[1]  (Vitale Dep. at 22, 24 27; Bell Dep. at 7-8.)  Minutes later, Vitale, Bell, and Jubb entered the Member Pick-up Court.  (Perry Dep. at 51; Bell Dep. at 7, 11.)  Vitale identified Perry as the one he had the confrontation with and Frazier and Bonner as the ones he identified as non-members.  (Vitale Dep. at 29; Jubb Dep. at 9, 11-12.)  Bell walked onto the court and stated, "I am going to have to ask some people for their membership cards."  (Bell Dep. at 13-14; Jubb Dep. at 9, 11-12.)  As Bell started to approach Frazier and Bonner, Perry told him to let them play.  (Bell Dep. at 13-14; Jubb Dep. at 9, 11-12.)  According to Bell, Perry "just kept getting in the way.  He just kept standing in front of me and getting in my face, so I couldn't get to them."  (Bell Dep. at 15.)  Bell then went to the Member Activities Court to obtain a copy of the league roster.  (*Id.* at 16.)  Shortly thereafter, Bell returned to the court and stopped the

---

[1] During the exchange, Vitale never told Ricky he had to leave the gym nor denied him the use of the basketball courts.  (Perry Dep. at 87.)

game again.  (Perry Dep. at 55; Jubb Dep. at 14-15.)  Perry did not identify himself as a member and responded "no" to questions relating to whether he was Frazier or Bonner. (Bell Dep. at 20; Jubb Dep. at 14-15; Perry Dep. at 55.)  Bell asked for Perry's name and to see his membership card.  (Bell Dep. at 16, 21-24; Bonner Dep. at 40.)  According to Bell, Perry was yelling at him, standing inches from his face.  (Bell Dep. at 21-24.)  Bell said "This isn't a big deal.  This is a little thing.  It will just take a minute, and you can keep playing basketball.  I am not trying to break this up or anything."  (Bell Dep. at 24.)  Perry refused to give Bell his name or show his membership card even though it was pinned to his shorts and covered by his shirt, which hung down to just above his knees.  (Perry Dep. at 69-71.)

The employees then called the police.  (Pls.' Compl. at ¶ 25.)  The police found Perry and asked him if he was a member, and if he had a membership card.  Perry provided the police with his name and membership card and stated that he and his cousins were being singled out because they were African-Americans.  (Perry Dep. at 65-69.)  The police left without taking further action.  (Pl.'s Compl. at ¶ 28.)  Perry indicates that he filed a complaint with the manager of the facility but nothing ever came of the complaints.  (*Id.* at ¶¶ 29-30.)

## II.  STANDARD

### A.  Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories,

admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486,492 (6th Cir. 2004) ("we must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") The court does not weigh the evidence to

6

determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

### III.  DISCUSSION

#### A.  Count I:  Michigan's Elliott-Larsen Civil Rights Act ("ELCRA")

The ELCRA states that:

> Except where permitted by law, a person shall not ... [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status.

M.C.L. § 37.2302(a).  The ELCRA defines a "place of public accommodation" as:

> a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.

M.C.L. § 37.2301(a).

In *Kassab v. Michigan Basic Property Ins. Ass'n*, 491 N.W.2d 545 (Mich. 1992), the Michigan Supreme Court held that a claim for breach of an insurance contract could not be brought under the ELCRA because the terms of the policy, once issued, are no longer "services . . . made available to the public" but are private rights and obligations of the contracting parties. *Id.* at 547.

While the Michigan Supreme Court has not ruled on the exact issue presented here, if Defendant Life Time were to deny Plaintiffs "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" to a club member on the basis of religion, race, color, national origin, age, sex, or marital status once he entered the club, it seems reasonable that they should be able to bring a claim

under the ELCRA. As the court asserted in *Sanders v. Southwest Airlines Co.*, 86 F. Supp.2d 739 (E.D. Mich. 2000), it would not be an adequate defense to argue that the contractual relationship between Plaintiffs and Defendant did not prohibit such discrimination. *Id.* at 744 (African-American airline passenger brought action against airline and flight attendant alleging race discrimination in violation of ELCRA); Mich. Comp. Laws § 37.2302(a).

The court, however, need not rule on this basis. In order to maintain their ELCRA claim, Plaintiffs must create an issue of fact on whether they were denied "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations . . . because of race," which they have not done. *Id.* The court will first discuss the "equal" prong of § 37.2302(a). *Id.*

To prove race discrimination (i.e. unequal provision of services based on race), Plaintiff may prove either intentional discrimination or disparate treatment by Defendant. *See Reisman v. Regents of Wayne State University*, 470 N.W.2d 678, 685 (Mich. Ct. App. 1991); *see also Meagher v. Wayne State University*, 565 N.W.2d 401, 409-10 (Mich. Ct. App. 1997) (explaining that intentional discrimination and disparate treatment are different methods of proving discrimination but not separate theories). Intentional discrimination may be proved by showing that the plaintiff is a member of a protected class, that the decision-maker had a pre-disposition to discriminate against members of the protected class, and the decision-maker acted on that pre-disposition. *See Reisman*, 470 N.W.2d at 685.

Disparate treatment may be proved by showing that the plaintiff is a member of a protected class and was treated differently than persons of a different class for the

8

same or similar conduct. *Id.* Under either theory, a plaintiff claiming that an action is motivated by discrimination must produce some facts from which a factfinder could reasonably infer unlawful motivation. *See Fonseca v. Mich. State Univ.*, 542 N.W.2d 273, 275 (Mich. Ct. App. 1995).

In determining whether a material issue of fact exists regarding a claim of disparate treatment, the court must determine whether Plaintiffs have offered direct evidence of discrimination or circumstantial evidence that would allow an inference of discriminatory treatment. *Anthony v. BTR Automotive Sealing Sys.*, 339 F.3d 506, 514 (6th Cir. 2003) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)). To withstand summary judgment, an ELCRA plaintiff is required either to "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.,* 319 F.3d 858, 864-65 (6th Cir. 2003).

Plaintiff Kimbrough-Perry has not presented to the court any evidence of race discrimination with respect to intentional discrimination nor disparate treatment. Throughout the course of the entire incident which gave rise to this action, Kimbrough-Perry was on the second floor of the Lifetime Fitness facility engaging in a workout. (Kimbrough-Perry Dep. at 16.) Kimbrough-Perry captured the full scope of her involvement in this incident when she testified that she looked over the glass on the second floor and "saw people in little huddles." (*Id.* at 17.) She stated that she saw these people "standing around and talking. . . . [But, she] didn't really see [her] husband or Dujuan or Sidney." (*Id.*) She also testified that she did not have any conversation with any Life Time employees on the night that the incident occurred. (*Id.* at 36.)

Instead, Kimbrough-Perry stated that no one did anything to her physically, rather she was harmed emotionally. (*Id.*) She stated that "when [she] entered into [the] gym and [her] husband was that upset and no one was there, not a manager, not an employee, to tell me anything, to console me. I see police coming up behind me, and next thing I know they want my husband, I'm freaking out. I suffer from anxiety. I just cannot believe the whole ordeal. I was so upset." (*Id.* at 36-37.)

Kimbrough-Perry has failed to present evidence that any Life Time employees had a pre-disposition for discriminating against African-Americans or that anyone treated her differently from similarly situated individuals at Life Time Fitness at any time before, during, or after this incident. (*Id.* at 16-17; 36-39.) There was no adverse action taken against Kimbrough-Perry, according to her own testimony, and she cannot prevail on her ELCRA discrimination claim.

Plaintiff Ricky Perry has presented no evidence nor even alleged that Life Time or its employees have a pre-disposition for racial discrimination against African-Americans. The undisputed evidence shows that Frazier and Bonner were not members of Life Time, and that Frazier and Bonner were playing pick-up basketball on the Member Pick-up Court in violation Life Time rules. (Bonner Dep. at 10; Frazier Dep. at 10.) When Vitale approached Fraizer, Bonner, and Perry, the undisputed evidence shows that it was in an effort to enforce the member-only rule. Mr. Perry did all of the talking and refused to answer Vitale's questions. (Bonner Dep. at 25-33.) At no time did Frazier or Bonner identify themselves. (*Id.*) Perry also testified that he experienced discrimination based on disparate treatment because Vitale "could have asked the two Caucasian guys on [his] team, he could have asked the guys on his team for a

membership, but he didn't.  He asked me.  He didn't ask me, he said it with a loud voice, authority, what is your name, do you have a membership."  (Perry Dep. at 93.)  But, Perry has not presented to the court admissible evidence that these two Caucasian players were similarly situated to him or engaged in conduct similar to him (i.e. non-member basketball players or hosting non-member basketball players that the Life Time staff recognized as such due to prior interaction).

In addition, Perry testified that it is very likely that Vitale approached him and his cousins because of his behavior, not because of his race.  Several parties, including Perry, have testified that it was Perry's superior play and competitive taunts in the game that attracted Vitale's attention and embittered him toward Perry.  Plaintiff testified that Vitale may have been asking him in particular for his membership because "he lost the team, he lost the game, and he flew off the handle."  (Perry Dep. at 44, 93-94.)  Perry claimed that "[his team] beat [Vitale's team], [his team] beat them real bad."  (*Id.* at 46.)

Even if Plaintiffs were able to establish evidence of intentional discrimination or disparate treatment, they have not presented any evidence that they were denied access to the club or any benefits of their membership, in violation of the "full" prong of ELCRA.  Life Time Fitness is a private club, whose rules clearly establish that non-members cannot use the basketball courts during pick-up games.  There is no dispute that those rules were violated on the occasion in question, and no dispute that a Life Time employee would act within his rights in inquiring about or enforcing those rules.  (Def.'s Mot. at Ex. 7.)  The Perrys have admitted that they visited the club without incident or complaint after the event giving rise to this suit, and there has been no evidence presented to the court that Plaintiffs were denied the full enjoyment of their

membership at Life Time.  (Kimbrough-Perry Dep. at 38-42.)

### B.  Count II:  Breach Of Contract/Violation of § 1981

In Count II of their Complaint, Plaintiffs allege that Defendant breached its membership agreement with Plaintiffs, and they were "denied the full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations of the Defendant's place of public accommodation because of their race."  (Pl.'s Compl. at ¶ 39.)  Like Count I, Count II fails because Plaintiffs cannot establish a prima facie case of race discrimination.  In order to state a prima facie case of race discrimination under 42 U.S.C. § 1981, in a commercial establishment case, a plaintiff must prove:

> (1) plaintiff is a member of a protected class;
> (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and
> (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862 (6th Cir. 2001).

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors. 42 U.S.C. § 1981.  The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Christian*, 252 F.3d at 868.  A plaintiff asserting a § 1981 claim must prove intentional discrimination.  *Id.* at 870.

As discussed above, it is obvious that Plaintiff Ricky Perry's cousins were singled out for questioning and challenge, i.e., that "discrimination" (in the generic sense of the word) occurred, but it is also clear from the undisputed evidence that such discrimination was on account either of their and Perry's basketball prowess, or them being recognized by Life Time staff as ineligible non-members, or most likely, a potent combination of the two.  There is no evidence from which a reasonable jury could find that Plaintiffs experienced discrimination based on racial characteristics.  But, even if the court concluded that there was a triable issue of fact as to whether Plaintiffs experienced race discrimination, as discussed above, Plaintiffs have presented no evidence that they were deprived of services while similarly situated persons outside the protected class were not or that they received services in a markedly hostile manner which a reasonable person would find objectively discriminatory.  42 U.S.C. § 1981; Kimbrough-Perry Dep. at 16-17, 36-39; Perry Dep. at 44, 46, 93-94.

## IV. CONCLUSION

IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 11] is GRANTED.

      S/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated: June 8, 2005

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 8, 2005, by electronic and/or ordinary mail.

      S/Lisa G. Teets
      Case Manager and Deputy Clerk
      (313) 234-5522